# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
No. 18-683V
Filed: November 29, 2022
PUBLISHED

| | |
|---|---|
| MERRICK BRUNKER,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Special Master Horner<br><br>Attorneys' Fees and Costs; Denial; Reasonable Basis; Meningococcal vaccine; Human papillomavirus ("HPV") vaccine |

*Phyllis Widman*, Widman Law Firm, LLC, Northfield, NJ, for petitioner.
*Alexis Babcock*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION REGARDING ATTORNEYS' FEES AND COSTS[1]

   On May 14, 2018, petitioner, Merrick Brunker, filed a petition under the National Childhood Vaccine Act, 42 U.S.C. § 300aa-10-34 (2012)[2] alleging that he suffered myalgia, headaches, unsteady movements, tics, chest pain, aggression and depression, emotional and psychological distress caused-in-fact, or alternatively, significantly aggravated, by his July 15, 2016 meningococcal and human papillomavirus ("HPV") vaccinations.  (ECF No. 1, p. 1.)  On December 9, 2021, petitioner voluntarily dismissed his petition.  (ECF No. 84.)  Petitioner now moves for an award of attorneys' fees and costs which respondent opposes, arguing that petitioner lacked a reasonable basis in bringing his petition.  (ECF Nos. 91-92.)  For the reasons described below, I find that

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy.  If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Hereinafter, all references to "§ 300aa" refer to sections of the Vaccine Act.

1

petitioner should be awarded attorneys' fees and costs in a reduced amount, because this case lost its reasonable basis after my June 26, 2020 Rule 5 conference.

I.  **Factual History**

Petitioner's medical history prior to vaccination was significant for difficulty sleeping, anxiety, tics, and chest pain. (Ex. 2, pp. 93, 97, 112-13, 124.) On July 15, 2016, petitioner presented to Tina Kosakyan, M.D., for "pain and [a] Tdap [vaccine]" after stepping on a nail the day prior. (*Id.* at 133.) Dr. Kosakyan found that petitioner had a "[s]uperficial skin abrasion, no signs of infection." (*Id*. at 134.) Dr. Kosakyan administered petitioner's meningococcal and HPV vaccinations during this visit. (*Id*. at 134, 136.) Four days later, on July 19, 2016, petitioner returned to Dr. Kosakyan for a follow-up and complained that his ankle was still swollen and in pain. (*Id.* at 142-43.) Dr. Kosakyan assessed petitioner with cellulitis and prescribed Bactrim. (*Id*. at 144.) The record from this visit does not indicate that petitioner reported any additional symptoms. (*See id.* at 142-51.)

Petitioner presented to Community Memorial Hospital on July 21, 2016, with his parents. (Ex. 6, p. 3-4.) Petitioner's father indicated that since petitioner stepped on a nail and received meningitis and HPV vaccinations the week prior, petitioner had been exhibiting increasingly agitated and aggressive behavior and had not been sleeping. (*Id*.) Petitioner's parents attributed petitioner's aggressive behavior to his meningococcal and HPV vaccinations. (*Id*.) The physician also noted that petitioner had a history "of possible Tourettes [*sic*] w/ verbal and physical tics which have also improved in the past week." (*Id*. at 3.) Results from a brain CT, lumbar puncture, blood analysis, and urine toxin screen returned normal. (*Id*. at 4.) Petitioner was discharged and diagnosed with aggressive behavior and was encouraged to follow up with a psychiatrist. (*Id*.) The following day, on July 22, 2016, petitioner's father called Kaiser Permanente and notified them that petitioner had undergone a lumbar puncture the day before and was currently experiencing a headache, with pain scoring 4/10, and intermittent tingling and jolts in his legs. (Ex. 2, p. 153.)

On July 27, 2016, petitioner reported to The Claudia Jensen Center for Integrated Medicine ("CJC"). (Ex. 4, pp. 10-18.) In a self-completed questionnaire, petitioner indicated that he had insomnia, fatigue, headaches, depression, anxiety, muscle pain, and "P.O.T.S., 10 days. After HPV vaccine." (*Id*. at 12.) Margaret Peterson, M.D., noted that petitioner had experienced a general worsening of his neurological symptoms after the Gardasil vaccine. (*Id*. at 10.) Dr. Peterson's assessment was an uncontrolled anxiety disorder and a possible neurological disorder that she questioned was secondary to the vaccines. (*Id*.)

The following day, on July 28, 2016, petitioner returned to Kaiser Permanente where he saw Heidi Escurra, M.D., and complained of chest tightness, sharp pain in his chest, and sensitivity to light and noise as a reaction to the HPV vaccine. (Ex. 2, p. 158-59.) Petitioner told Dr. Escurra that as soon as he got his HPV vaccine on July 15, 2016, he had a strange taste in his mouth and felt dizzy and faint. (*Id.* at 159.) He indicated that his Tourette-like movements (since childhood) then intensified, that he felt

weak with a strong headache, and felt chest pressure and sharp pains.  (*Id*.)  Petitioner also indicated that he had cellulitis at the vaccination site for which he was prescribed Bactrim.  (*Id*.)  He also complained that he had a constant headache that would get worse when sitting down.  (*Id*.)  The family indicated that they had looked into taking him to a hyperbaric oxygen chamber for detoxification from the vaccines and were willing to pay for it on their own.[3]  (*Id*. at 159-60.)  Dr. Escurra's assessment was an adverse drug reaction, along with myalgia, chest pressure, muscle spasms, and headaches.  (*Id*. at 161.)  Dr. Escurra later consulted with neurologist, Nazely Ashikian, M.D., who indicated that it was unlikely that petitioner's symptoms were from the HPV vaccine.  (*Id*. at 159.)

On August 9, 2016, petitioner returned to Kaiser Permanente and requested that his doctor's note originally excusing him from work until July 27, 2016, be extended to August 8, 2016, since he had taken an additional week off from work but now felt ready to go back.  (Ex. 2, p. 168.)  Petitioner indicated that he had not been experiencing any other symptoms.  (*Id*.)  Dr. Escurra signed off on the modified work note that allowed petitioner to return to work on August 8, 2016.  (*Id*.)

Petitioner returned to CJC on April 22, 2017.  (Ex. 4, p. 9.)  At this visit, Dr. Peterson's assessment included "anxiety – somewhat better" and "tics/spasm/neuro injury s/p [status post] HPV vaccine."  (*Id*.)   Dr. Peterson also noted that petitioner's father had completed a VAERS report and had retained an attorney to assist with compensation.  (*Id*.)  On July 19, 2017, petitioner returned to CJC and completed another questionnaire wherein he indicated that he sought medication for muscle spasms, nausea, migraines, anxiety, and insomnia.  (*Id.* at 6.)  Dr. Peterson's assessment was anxiety and tics, and petitioner indicated that cannabis had been helping his symptoms.  (*Id*. at 5-6.)  Two years post-vaccinations, on July 11, 2018, petitioner returned to CJC.  (Ex. 8, p. 2.)  No new problems were reported.  (*Id*.)  Dr. Peterson's assessment was anxiety, tics, and insomnia, and the continued use of cannabis was recommended.  (*Id*.)

On November 13, 2019, petitioner had an office visit and examination with his expert for this case, rheumatologist Arthur Brawer, M.D.  (Ex. 22.)  Dr. Brawer indicated that petitioner developed a "multisystem illness [that] encompasses numerous symptoms and signs, including headaches, dizziness, fatigue, fever, temperature dysregulation, reactivation of a prior Tourette-like syndrome, widespread generalized pain, chest pressure, weakness, photophobia, nausea, paresthesias, dysesthias, emotional lability, palpitations, abdominal pains, alternating constipation and loose stools, insomnia, nonrestorative sleep, cognitive dysfunction, dry eyes and dry mouth, night sweats, odor and smell hypersensitivity, recurrent infections (sinusitis and sore throats), weight loss, tinnitus, polyarthralgias, and peripheral nerve dysfunction (both sensory and motor)."  (*Id*. at 3.)  However, Dr. Brawer did not offer any specific diagnosis to explain these multisystem signs and symptoms.

---

[3] Petitioner presented to Hyperbaric Centers of California on August 1, 2016.  (Ex. 5.)  In a self-completed questionnaire, petitioner indicated a history of a vaccine reaction and headaches.  (*Id*. at 4.)  Petitioner received hyperbaric therapy on that date.  (*Id.* at 10.)

3

**II.     Procedural History**

On May 14, 2018, petitioner filed his petition alleging that he suffered from various conditions, including myalgia, headaches, unsteady movements, tics, chest pain, aggression and depression, and emotional and psychological distress caused-in-fact, or alternatively, significantly aggravated by his July 15, 2016 meningococcal and human papillomavirus ("HPV") vaccinations.  (ECF No. 1, p. 1.)  This case was initially assigned to Special Master Moran.  (ECF No. 4.)  On June 4 and June 22, 2018, petitioner filed his vaccination record and medical records.  (ECF Nos. 9-10.)  Petitioner filed additional medical records on August 8, 2018.  (ECF No. 17.)  On November 23, 2018, respondent filed his Rule 4(c) report arguing that the evidence presented did not meet petitioner's burden of proof and recommending against compensation.  (ECF No. 20.)

The case was reassigned to my docket on August 27, 2019. (ECF No. 46.)  Thereafter, petitioner filed an expert report by rheumatologist Arthur Brawer, M.D., on December 11, 2019.  (ECF No. 53; Ex. 22.)  In his first report, Dr. Brawer confirmed that he conducted an evaluation and physical examination of petitioner.  (Ex. 22.)  He did not offer any specific diagnosis but indicated that petitioner "developed a chronic and permanent multisystem illness."  (*Id*. at 3.)  He opined that petitioner's condition was "caused by organosiloxanes (organosilicones) and silica (silicon dioxide) all of which are components present in the HPV vaccine."  (*Id*.)  He cited to a single article of which he was the author.  (*Id*.)

On January 28, 2020, I issued a scheduling order explaining that "Dr. Brawer's expert report is insufficient to meet petitioner's burden under *Althen* for a number of reasons."  (ECF No. 55, p. 1.)  First, I noted the report was incomplete in that Dr. Brawer did not confirm that he had reviewed petitioner's medical records.  Second, petitioner did not file the article cited in the report.  Third, the theory of causation was "vague at best," especially in that Dr. Brawer did not explain what injury he believed petitioner suffered.  And, finally, the opinion appeared to be based on temporal association alone.  (*Id*. at 2.)  I ordered petitioner to file a supplemental report from Dr. Brawer that more thoroughly explained his opinion, more explicitly discussed petitioner's medical records, and included a more thorough review of relevant medical literature.  (*Id*.)

Thereafter, petitioner filed a supplemental report by Dr. Brawer and accompanying literature on March 6, 2020.  (ECF No. 56; Ex. 24.)  Respondent filed responsive expert reports by immunologist Andrew MacGinnitie, M.D., Ph.D., and toxicologist Kendall Wallace, Ph.D., on June 9, 2020.  (ECF Nos. 59, 60; Exs. A, C.)  On June 26, 2020, I held a Rule 5 status conference.  (ECF No. 61.)  Following my review of the expert reports I identified numerous fundamental flaws in Dr. Brawer's opinion and recommended that petitioner "either dismiss his petition or present a different theory of causation."  (*Id*. at 1.)  Specifically:

- Dr. Brawer's opinion was premised on the HPV vaccine containing silica and/or organosiloxanes; however, he provided no support for such an

4

- assertion while respondent's toxicology expert submitted evidence tending to refute the assertion.  (*Id*. at 2.)

- Continuing from that initial unsupported premise, Dr. Brawer based his opinion in significant part on comparison of the HPV vaccine to injuries stemming from silicone breast implants; however, this was based solely on Dr. Brawer's ipse dixit extension of observations from one medical context to another unrelated context and his own prior writings suggested a dramatically different dose with respect to breast implants than would potentially be implicated by vaccination, a point underscored and further discussed by respondent's toxicology expert.  (*Id*. at 3.)

- Dr. Brawer offered no diagnosis for petitioner's condition and instead premised his opinion on the existence of a novel HPV-vaccine syndrome.  However, this was based on specific studies that I had previously addressed and found unreliable.  (*Id*. at 4 (citing *Balasco v. Sec'y of Health & Human Servs*., No. 17-215V, 2020 WL 1240917, at *29-32 (Fed. Cl. Spec. Mstr. Feb. 14, 2020).)

- Because Dr. Brawer had not identified any pertinent diagnosis apart from the unreliable HPV-vaccine syndrome, it was not clear petitioner would be able to specify his injury and shoulder his burden of proof on causation.  (*Id.* at 5 (citing *Broekelschen v. Sec'y of Health & Human Servs*., 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Stillwell v. Sec'y of Health & Human Servs*., 118 Fed. Cl. 47, 56 (2014).)

- While Dr. Brawer clearly based his causal opinion on silica and organosiloxane toxicity, he also less clearly cited articles purporting to show that vaccines can lead to either autism or HPV-vaccine syndrome via the theory of "ASIA" or autoimmune Syndrome Induced by Adjuvants; however, I noted that prior decisions in the program have been highly critical of ASIA.  (*Id*. at 5-6.)

- Dr. Brawer appeared to be opining beyond his area of expertise.  I noted that "Dr. Brawer is a rheumatologist, yet he has not based his opinion on any identified rheumatological injury . . . Moreover, he specifically identifies the condition as multisystemic and seeks to ground his opinion in toxicology, neurology, and metabolic medicine.  Despite his prior interest in breast implant toxicity, Dr. Brawer does not have any credentials in any of these specialties."  (*Id*. at 6.)

Based on these observations, I advised petitioner that

> Dr. Brawer's opinion remains unpersuasive after the filing of two reports.  Moreover, based on the specific issues discussed above, I am not at this point persuaded that Dr. Brawer will be able to meaningfully remedy the

5

> issues inherent to his causation opinion. Accordingly, petitioner is urged to either dismiss this case or present a report by a different expert presenting a different theory that is based on a cognizable injury and is more firmly grounded in sound and reliable scientific explanation.

(*Id*. at 6.) Citing the above-referenced *Balasco* case, I explained that some prior cases alleging a post-HPV-vaccine syndrome did ultimately have a reasonable basis despite failing to preponderantly establish entitlement to compensation. Accordingly, I explained that

> though I do not reach that question at this time, it may potentially be the case upon subsequent analysis that there was a reasonable basis for filing this petition. Notably, however, I caution that the above-described shortcomings in Dr. Brawer's opinion are significant and substantial enough that I am not confident there will be a reasonable basis for further development of his opinion moving forward. Failure to meaningfully and persuasively address the concerns raised herein could result in non-payment of fees post-dating this order.

(*Id*.)

Petitioner subsequently filed three supplemental reports by Dr. Brawer, including a report directly responding to the Rule 5 order. (ECF No. 62; Exs. 35-37.) In that report, Dr. Brawer indicated that two additional self-authored articles should be considered that "bolster my medical theories." (Ex. 37, pp. 1-2.) He contended that with these articles "the burden of proving causation is also patently satisfied." (*Id.* at 2.) Dr. Brawer reaffirmed his reliance on breast implant illnesses as providing "both a sound foundation and a plausible scientific explanation." (*Id*. at 3.) However, he offered no further information regarding the contents of the HPV vaccine and instead suggested that the fact of, and quantity of, harmful substances in the vaccine should be considered a "non issue" unless depositions of the biochemists and product engineers responsible for the vaccine are conducted. (*Id*. at 2.) He acknowledged that the injury he proposes in this case is "genuinely novel" and indicated that "[a]s with any novel medical entity that initially appears on the scene, 'preponderant evidence' takes decades to assemble." (*Id*. at 2-3.) He disclaimed any reliance on ASIA, calling it a "fantasia." (*Id*.) He contended that it is "naïve" to conclude that his opinion extended beyond rheumatology. (*Id*.)

In a follow up order, I noted that Dr. Brawer had cited unfiled literature. I ordered petitioner to file the outstanding literature and to confer with respondent regarding how to proceed. (ECF No. 64.) I cautioned that "[t]he parties are encouraged to have a full and frank discussion and petitioner is urged to carefully consider whether further litigation is *reasonably* necessary to reach an informed outcome in this case given his initial burden of proof and his filings to date." (*Id*. at 2 (emphasis original).) Thereafter, petitioner advised that he wished to continue the case and a status conference was requested. (ECF No. 67.)

6

The requested status conference was held on November 16, 2020. (ECF No. 69.) Noting that I had previously provided guidance pursuant to Vaccine Rule 5, "I explained that Dr. Brawer's three subsequently filed reports have not substantially changed the status of this case and many of the previously raised issues remain active considerations." (*Id*. at 1.) Respondent requested the opportunity to file responsive expert reports and I provided some further guidance to the parties on additional points to address "[t]o the extent the parties do wish to supplement the record." (*Id*.) Specifically, I noted that respondent's expert had raised the issue that Dr. Brawer's self-authored articles appear in unreliable "predatory" journals. (*Id*.) I also filed as a Court Exhibit the FDA warning recommendation for silicone breast implants previously cited by Dr. Brawer, noting that the document in fact indicates the casual relationship between breast implants and so-called "breast implant illness" remains "unclear." (*Id.* at 2.)

After respondent filed supplemental reports by Drs. MacGinnitie and Wallace (ECF No. 70; Exs. E, H), petitioner was ordered to file a status report indicating how he intended to proceed; however, he instead filed a further supplemental report by Dr. Brawer (ECF No. 71; Ex. 40). In this report, Dr. Brawer reiterated that his theory is based on "chemical toxicity present in human papillomavirus vaccines." (Ex. 40, p. 1.) He indicated that the HPV-vaccine syndrome he proposes might involve autoantibodies as part of "secondary amplification loops" but that "autoimmune mechanisms are not likely to be the initiators of this type of vaccination induced disorder." (Ex. 40, p. 2.)

Thereafter, a follow up status conference was held on February 4, 2021. (ECF No. 73.) During the status conference, petitioner's counsel inquired as to whether she had a reasonable basis to pursue a toxicology expert to opine in the case. (*Id*.) In response, I explained that

> I would allow petitioner time to explore whether a possible toxicology expert report is feasible, noting that respondent has filed reports by a toxicology expert and acknowledging that there are aspects of petitioner's theory that could hypothetically be strengthened by a credible toxicology report. However, I cautioned that I cannot speak to petitioner's further question of reasonable basis without knowing the basis, quality, and scope of the toxicologist's ultimate opinion. I also cautioned that my Rule 5 order of June 26, 2020 discussed issues going beyond the toxicological aspects of the case that would remain relevant to any ultimate reasonable basis analysis.

(*Id*.)

Petitioner subsequently filed an expert report by toxicologist Ernest Chiodo on July 2, 2021. (ECF No. 77; Ex. 45.) Despite confirming that he had reviewed Dr. Brawer's reports, Dr. Chiodo did not discuss or support Dr. Brawer's theory *at all*. (Ex. 45.) Instead, Dr. Chiodo offered a conclusory opinion that adverse effects from the HPV vaccine are due to "an immunological response induced by the foreign chemicals,"

7

citing only the aluminum adjuvant contained in the vaccine.  (*Id*. at 5-6.)  One might suspect that Dr. Chiodo was expressing an opinion consistent with the ASIA concept Dr. Brawer disclaimed as "fantasia," but that is not explicit in the report.  Dr. Chiodo purported to have conducted a review of medical literature, but did not disclose what literature supported his opinion.  Another follow up status conference was held on August 26, 2021.  (ECF No. 79.)  I advised that

> after reviewing his report it does not appear that Dr. Chiodo endorses Dr. Brawer's opinion as he does not explicitly discuss the prior reports, instead discusses aluminum adjuvants rather than silica specifically, and ultimately provides only a very general report without citing to any medical literature or providing analysis explaining the basis of his opinion.  I explained that due to the lack of detail in Dr. Chiodo's report, the concerns with petitioner's ability to meet his burden that I expressed in the previous Rule 5 conference remain unresolved.  I explained that, given the lack of analysis supporting Dr. Chiodo's opinion, petitioner's counsel would likely be in the best position to assess the strength of petitioner's case after speaking with Dr. Chiodo to evaluate the basis for his opinion.  Petitioner's counsel indicated that she understood the issues I raised, and that she would consult Dr. Chiodo and petitioner in order to assess how to proceed in this case.  If Dr. Chiodo is not prepared to add substantial additional information to his report, then I continue to recommend that petitioner consider voluntarily dismissing this case.

(*Id*.)

Petitioner subsequently advised that he would seek dismissal (ECF No. 82) and filed a motion to voluntarily dismiss on December 10, 2021, acknowledging that "[a]n investigation into the facts and science supporting this case has demonstrated to petitioner that he [would] be unable to prove that he is entitled to compensation in the Vaccine Program" and that "to proceed further would be unreasonable and would waste the resources of the Court, the respondent, and the Vaccine Program." (ECF No. 85, p. 1.)  A decision dismissing this case issued the same day.  (ECF No. 86.)

Petitioner filed an application for attorney fees and costs seeking $70,620.49 on February 25, 2022.  (ECF No. 91.)   Respondent filed a response on March 10, 2022.  (ECF No. 92.)  Petitioner filed a reply on March 16, 2022.  (ECF No. 93.)

### III.     Legal Standard

Petitioners who are denied compensation for their claims brought under the Vaccine Act may still be awarded attorneys' fees and costs "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."  42 U.S.C. § 300aa-15(e)(1); *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1360-61 (Fed. Cir. 2012).  But even when a claim was brought in good faith and has a reasonable basis, a special

master may still deny attorneys' fees.  See 42 U.S.C. § 300aa-15(e)(1); *Cloer*, 675 F.3d at 1362.

"Good faith" and "reasonable basis" are two distinct requirements under the Vaccine Act.  *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017).  Good faith is a subjective inquiry while reasonable basis is an objective inquiry that does not factor subjective views into its consideration.  *See James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021).  In this case, petitioner's good faith is not challenged, leaving only the question of whether there was a reasonable basis for the filing of the petition.

The evidentiary standard for establishing a reasonable basis as prerequisite to an award of attorneys' fees and costs is lower than the evidentiary standard for being awarded compensation under the Vaccine Act.  To establish a reasonable basis for attorneys' fees, the petitioner need not prove a likelihood of success.  *See Woods v. Sec'y of Health & Human Servs.*, No. 10-377V, 2012 WL 4010485, at *6-7 (Fed. Cl. Spec. Mstr. Aug. 23, 2012).  Instead, the special master considers the totality of the circumstances and evaluates objective evidence that, while amounting to less than a preponderance of evidence, constitutes "more than a mere scintilla" of evidence.  *Cottingham v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1344, 1346 (Fed. Cir. 2020); *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 287 (Fed. Cl. 2018).

"More than a mere scintilla" of objective evidence supporting causation can derive from medical records that provide "only circumstantial evidence of causation." *James-Cornelius*, 984 F.3d at 1379-80.  For example, in *James-Cornelius* the Federal Circuit found significance in 1) petitioner's medicals records containing a doctor's note questioning whether a vaccine adverse event should be reported, 2) the medical course suggesting a challenge-rechallenge event of petitioner's symptoms becoming worse after additional injections of the vaccine, 3) medical articles hypothesizing that the vaccine can cause the symptoms at issue, and 4) petitioner having suffered some of the same symptoms that were listed in the vaccine's package insert as potential adverse reactions of the vaccine);[4] *see also Cottingham,* 971 F.3d at 1346 (finding that petitioner's medical records showed at minimum circumstantial evidence of causation where petitioner's medical records showed that petitioner received the Gardasil vaccine and subsequently experienced symptoms that were identified in the Gardasil package insert as potential adverse reactions of the vaccine).

Important to this case, however, the Federal Circuit has confirmed that a case can lose its reasonable basis as it proceeds.  *Perreira v. Sec'y of Health & Human*

---

[4] Nothing in *James-Cornelius* suggests the full extent of what may constitute circumstantial evidence, but the four examples of circumstantial evidence in *James-Cornelius* provide some guidance regarding the types of circumstantial evidence that may be considered in determining whether a reasonable basis was established.  Conversely, the Federal Circuit also stressed in *James-Cornelius* that an award of attorneys' fees and costs is within the special master's discretion and remanded the case for further proceedings.  984 F.3d at 1381.  Accordingly, it is also not the case that the presence of these specific elements of circumstantial evidence necessarily compel a finding that reasonable basis exists.

*Servs.*, 33 F.3d 1375, 1376-77 (Fed. Cir. 1994). Counsel has a duty to avoid frivolous litigation and should use "reasoned judgment in determining whether to . . . pursue a claim." *Murphy v. Sec'y of Health & Human Servs.*, 30 Fed. Cl. 60, 62 (1993), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995). "[T]he [Vaccine] Program's interest in promoting attorney representation in vaccine cases, as contemplated by the attorneys' fees provision of the statute, must be balanced carefully against the court's examination of the reasonableness of the basis for bringing the vaccine petition." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *11 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Although counsel has an "ethical obligation to be a zealous advocate," that does not give counsel a "blank check to incur expenses without regard to the merits of [the] claim." *Perreira*, 27 Fed. Cl. 29, 34-35 (1992).

### IV.    Party Contentions

Petitioner's initial motion did not contain a legal argument for why petitioner should be awarded attorneys' fees and costs. (*See* ECF No. 91.) Respondent responded by arguing that petitioner provided no objective evidence because petitioner 1) did not clearly identify any diagnosed vaccine injury, 2) has not offered either a reputable scientific medical theory of causation or a medically acceptable temporal window such that causation could be inferred, and 3) did not, in fact, furnish any reliable expert opinion. (ECF No. 92, pp. 9-12.)

In reply, petitioner disputes that he had no diagnosis. (ECF No. 93, p. 3.) Instead, he contends that he "had a diagnosis that was simply novel. Petitioner's theory of the case is that the listed symptoms he experienced *are* the diagnosis: that is, vaccine-induced toxicity." (*Id.* (emphasis in original).) Further, petitioner argues that "Althen prong three was present and he and his experts believed that they would be able to prove Althen prongs one and two." (*Id.*) Petitioner stresses that Dr. Brawer filed reports responsive to the undersigned's Rule 5 order and that respondent subsequently requested an opportunity to respond to those reports. (*Id.* at 1-2.) Petitioner intimates that the fact that respondent felt the need to rebut Dr. Brawer's supplemental reports is evidence that they advanced the case subsequent to the Rule 5 order. (*Id.* at 2.) Petitioner contends that there was a reasonable basis to pursue this case throughout its pendency and specifically indicates that reasonable basis remained "until after Petitioner's toxicologist's opinion." (*Id.* at 3.)

### V.    Reasonable Basis Determination

This is not the first case to allege that the HPV vaccine caused a constellation of symptoms. While these cases have typically resulted in dismissal, determining whether there was a reasonable basis for filing has been less clear cut given that there is literature available that purports to link these symptoms to the HPV vaccine. In fact, the *Cottingham* case discussed above involved such an allegation. 971 F.3d 1337. In *Cottingham*, the petitioner alleged post-HPV vaccine headaches, fainting, and menstrual difficulties, which were documented in her medical records, but for which she could not obtain a supporting causal opinion from an expert. *Id.* at 1341. Though the case was remanded for further proceedings to weigh the evidence, the Federal Circuit

10

reasoned that medical record evidence of symptoms coupled with separate evidence addressing vaccine-causation of those symptoms (in that case the vaccine package insert) would constitute circumstantial objective evidence that could help support a reasonable basis.  *Id*. at 1346.

Similar to the *Cottingham* case, the record of this case includes objective evidence in the form of contemporaneous medical records documenting the existence of petitioner's alleged post-vaccination symptoms, particularly petitioner's myalgia, headaches, unsteady movements, tics,[5] and chest pain.  (*See*, *e.g.*, Ex. 2, p. 153, 156-161; Ex. 4, p. 12.)  Additionally, this case contains literature authored by Dr. Brawer that in turn relies on several pieces of medical literature beyond his own ipse dixit purporting to causally link at least some of those symptoms to the HPV vaccine.  Specifically, the studies emphasize that patients have exhibited an array of symptoms, including fatigue, headaches, and widespread pain, following the HPV vaccine.  *See* Arthur E. Brawer, *Hidden Toxicity of Human Papillomavirus Vaccine Ingredients*, 5 J. RHEUMATIC DISEASES & TREATMENT 1, 2 (Ex. 25) (citing Svetlana Blitshteyn et al., *Autonomic Dysfunction and HPV Immunization: An Overview*, 66 IMMUNOLOGICAL RESEARCH 744 (2018); Kazuki Ozawa et al., *Suspected Adverse Effects After Human Papillomavirus Vaccination: A Temporal Relationship Between Vaccine Administration and the Appearance of Symptoms in Japan*, 40 DRUG SAFETY 1219 (2017); Manuel Martínez-Lavín, *Fibromyalgia-like Illness in 2 Girls After Human Papillomavirus Vaccination*, 20 J. CLINICAL RHEUMATOLOGY 392 (2014)).  Moreover, as explained above, petitioner's treating physicians, Dr. Peterson and Dr. Escurra, were wiling to at least question whether petitioner was experiencing neurologic symptoms secondary to his vaccination.  (Ex. 4, p. 10 (Dr. Peterson questioning neurologic symptoms secondary to vaccination; Ex. 2, p. 159 (Dr. Escurra assessing adverse drug reaction to vaccine and recommending neurology follow up (*but see* Ex. 2, p. 161 (neurologist disagreeing).)

As I explained in the prior Rule 5 conference, the above-referenced medical articles discussed in Dr. Brawer's own publication, even if directly filed into the record, would not meet petitioner's preponderant burden of proof.  *Balasco*, 2020 WL 1240917, at *29-32.  However, the body of literature does provide *some* (albeit weak) support underlying Dr. Brawer's opinion. When coupled with the available medical records, all of it together is sufficient (if barely) to satisfy the far less onerous "more than a mere scintilla" of evidence required to support a reasonable basis for the initial filing of this petition.  *Accord Thomas v. Sec'y of Health & Human Servs.*, No. 20-886V, 2021 WL 2389837, at *8-9 (Fed. Cl. Spec. Mstr. May 17, 2021); *Balasco v. Sec'y of Health & Human Servs.*, No. 17-215V, 2020 WL 2461911 (Fed. Cl. Spec. Mstr. Apr. 16, 2020); *Merino v. Sec'y of Health & Human Servs.*, No. 19-1723V, 2022 WL 1657945 (Fed. Cl. Spec. Mstr. Sept. 20, 2022).  Given that prior experience has shown that some experts have somewhat plausibly, if not ultimately persuasively, fit cases such as this into an

---

[5] Petitioner's overall clinical history is also complicated by his preexisting Tourette syndrome; however, it was not ultimately necessary to resolve this issue given petitioner's voluntary dismissal.  Petitioner did plead significant aggravation in addition to causation-in-fact and Dr. Brawer opined that petitioner's Tourette syndrome was "reactivated," though this was not explained. (Ex. 22, p. 3.)

existing HPV-syndrome hypothesis, it was reasonable for petitioner under the totality of the circumstances to try to press his case by securing Dr. Brawer's first two reports.

Nonetheless, it is also well established that a case can lose its reasonable basis as it progresses. *Perreira*, 33 F.3d at 1376-77. Here, Dr. Brawer's own opinion for this case was based on silica toxicity and a direct comparison to so-called breast implant illness, a point that he repeatedly emphasized in his later reports and which is not a consideration in the above-referenced HPV vaccine studies cited in his own prior article. There is little to nothing on this record that supports either Dr. Brawer's assertion that evidence of adverse effects from silicone breast implants are at all relevant to the post-vaccination context or his assertion the HPV vaccine even contains *any* of the silica he opines is harmful. Thus, once Dr. Brawer's opinion was fully articulated in his second report, it was readily apparent that it was unreliable. Accordingly, by absolutely no later than the date of the Rule 5 conference, petitioner's counsel was on notice that Dr. Brawer's opinion was inherently flawed and unworkable. Although petitioner's counsel subsequently attempted repeatedly to address the shortcomings of Dr. Brawer's opinion, none of the subsequent filings meaningfully addressed the previously identified issues with Dr. Brawer's opinion. In particular, petitioner's subsequently retained toxicologist conspicuously did not offer any discussion of or support for Dr. Brawer's silica opinion, purporting instead to provide an opinion alternatively based on aluminum adjuvants. (Ex. 45, pp. 5-6.) Moreover, that toxicology opinion was itself conclusory and obviously deficient.

In her reply, petitioner's counsel refers repeatedly to her "belief" that the claim could be supported; however, this goes to petitioner's good faith rather than the reasonable basis for the claim. *See Simmons*, 875 F.3d at 635-36 (Fed. Cir. 2017) (explaining that the reasonable basis requirement reflects "an objective inquiry unrelated to counsel's conduct"). In that regard, I cautioned petitioner during the Rule 5 conference that reasonable basis would be an issue moving forward and thereafter repeatedly advised petitioner at each step that the issues raised in the Rule 5 conference continued to go unaddressed. (ECF No. 61, p. 6; ECF No. 64, p. 2; ECF No. 69, pp. 1-2; ECF No. 73; ECF No. 79.)

For all these reasons, I find that petitioner did have reasonable basis to file this petition. However, I find that the case lost its reasonable basis when I advised petitioner during the Rule 5 conference on June 26, 2020, that Dr. Brawer's causal opinion was unreliable. At that point it was apparent that petitioner would not have a viable path forward based on Dr. Brawer's assessment of the case. All of the hours and costs incurred from that date up to the point petitioner began the process of dismissing his petition on November 16, 2021, were unreasonable.[6]

---

[6] During the Rule 5 conference petitioner represented that Dr. Brawer had substantially completed supplemental reports responsive to respondent's experts' reports. (ECF No. 61, p. 6 n.4.) Accordingly, I will include Dr. Brawer's June 29, 2020 invoice reflecting work responding to those reports (ECF No. 91-2, p. 8) within my below consideration of compensable costs.

### VI.     Amount of the Award

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir. 2008). This is a two-step process. *Id.* at 1347-48. First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Id.* at 1348. Special Masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (Fed. Cl. 1991.) Moreover, Special Masters are entitled to rely on their own experience and understanding of the issues raised. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (Fed. Cl. 1991), *aff'd in relevant part,* 988 F.2d 131 (Fed. Cir. 1993) (per curiam).

In this case, I have reviewed the billing records and additional documentation submitted with petitioner's motion. Upon my review, the overall amount sought in attorneys' fees is reasonable and the hourly rates and hours billed are reasonable and appropriate, except as discussed above. Petitioner seeks total attorneys' fees of $46,420.50. (ECF No. 91, p. 3.) Petitioner's counsel billed 64.95 hours at a rate of $350 per hour for work performed in 2018 and 2019 for a total of $22,732.50. (ECF No. 91-1, p. 9.) This is all allowable based on my above finding as to reasonable basis. Counsel billed a total of 60.50 hours at a rate of $375 per hour for work performed in 2020 and 2021 for a total of $22,687.50 (*Id.* at 17); however, fees billed between June 26, 2020, and November 16, 2021, are not being reimbursed. Based on my review, counsel billed 13.35 hours in 2020 up to and including the June 26, 2020 Rule 5 conference. At her rate of $375 per hour, this amounts to $5,006.25. Petitioner advised that he would be dismissing his claim on November 16, 2021. From that point forward, petitioner's counsel billed 5 hours at $375 per hour and 3 hours at $400 per hour, for a total of $3,075.00. Thus, the total attorneys' fees awarded are $30,813.75, a reduction of $15,606.75 from the $46,420.50 originally requested.

In addition to attorneys' fees, petitioner seeks total costs of $24,199.99. This includes the $400 filing fee, a $103.95 transcript fee, $7,550.00 in expert costs for Dr. Brawer's reports, $15,300.00 in expert costs for Dr. Chiodo's report, and petitioner's own travel costs for his in-person evaluation with Dr. Brawer, which totaled $846.04. (ECF No. 91, p. 3.) Consistent with the reasonable basis analysis above, Dr. Brawer's March 23, 2021 invoice for $1,800.00 will not be reimbursed, reducing his billing to $5,750.00. (ECF No. 91-2, pp. 10-11.) Petitioner also submits an invoice by Dr. Chiodo billing 23.9 hours for review of the case materials, 3.5 hours to review medical literature, and 3.2 hours to prepare his report, all at a rate of $500 per hour. (ECF No. 91-3.) Again, consistent with the reasonable basis analysis above analysis, this invoice will not be reimbursed.[7]

---

[7] Here, because I concluded that petitioner had lost any reasonable basis prior to consulting Dr. Chiodo, I do not reach the question of whether his rate or hours billed were reasonable. However, I also note that I would have serious concerns regarding the quality of Dr. Chiodo's report. Based on quality of work

Additionally, further reduction of the remaining invoices by Dr. Brawer is also warranted due to the poor quality of the reports.  In addition to the reasonable basis question, expert costs are also subject to the same reasonableness requirements as attorneys' fees.  *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992) ("The conjunction 'and' conjoins both 'attorneys' fees' and 'other costs' and the word 'reasonable' necessarily modifies both.  Not only must any request for reimbursement of attorneys' fees be reasonable, so also must any request for reimbursement of costs.").  This is assessed using the same type of lodestar calculation used to determine attorneys' fees.  Thus, expert costs must be assessed with regard to whether the quality of the work product ultimately aligns with the hours and rates requested.  *See Gruber v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 773, 796-798 (2010) (holding that the special master was justified in reducing expert fees given the "level of work performed").

As explained above, Dr. Brawer's reports in this case included fundamental flaws.  While the Rule 5 conference represented the point at which petitioner was put on notice that those flaws were untenable, quality issues suffused all of his reports.  The basic inadequacies of Dr. Brawer's first report prompted an order requiring petitioner to file the second report.  (ECF No. 55, pp. 1-2.)  The second report expounded on Dr. Brawer's unsupported assumption that the HPV vaccine contained silicates while his direct response to my Rule 5 order confirmed he could not actually support the assumption.  (Ex. 24, p. 2; Ex. 37, p. 2.)  The fact that Dr. Brawer has previously included this ipse dixit in prior publications does not render the assertion supported and Dr. Brawer knew, or surely should have known, at the time he drafted these reports that he was engaged in speculation.

Dr. Brawer has largely used a flat rate billing method and his invoices do not uniformly delineate the hours he expended or identify any specific hourly rate.  Accordingly, his invoices completely stymie any direct lodestar calculation.  This has been a repeated issue in prior cases in which Dr. Brawer has been involved.  *See, e.g., Drobbin v. Sec'y of Health & Human Servs.*, No. 14-225V, 2022 WL 1515024, at *4 (Fed. Cl. Spec. Mstr. Apr. 28, 2022); *Moses v. Sec'y of Health & Human Servs.*, No. 19-739V, 2020 WL 6778002, at *4 (Fed. Cl. Spec. Mstr. Oct. 23, 2020); *Hanson v. Sec'y of Health & Human Servs.*, No. 18-590V, 2020 WL 5628694, at *2 n.3 (Fed. Cl. Spec. Mstr. Aug. 24, 2020); *Whelan v. Sec'y of Health & Human Servs.*, No. 16-1174V, 2019

---

product it is highly unlikely his requested rate of $500 per hour could be supported.  Moreover, it appears that the hours expended were also unreasonable.  Dr. Chiodo billed 23.9 hours of work totaling $11,950.00 to review the medical records and prior filings in the case. (ECF No. 91-3, p. 2.)  However, his report reflects only a cursory understanding of petitioner's medical history or the prior expert opinions.  (Ex. 45.) For example, Dr. Chiodo billed 2 hours for review of respondent's experts' reports and Dr. Brawer's specific responses.  (ECF No. 91-3, p. 2.)  Yet his report includes not even a passing reference to the substance of either Dr. MacGinnitie's or Dr. Wallace's opinion.  (Ex. 45.)  He also billed 3.5 hours for a literature search.  (ECF No. 91-3.)  He stressed the fact of this search in his resulting report, but conspicuously declined to discuss the outcome of his search or cite to any pertinent literature addressing the causation question at issue.  (Ex. 45, pp. 5-6.)

WL 5290521, at *3 n.6 (Fed. Cl. Spec. Mstr. Sept. 11, 2019).  In light of the shortcomings of both Dr. Brawer's reports and his invoices, I reduce his remaining billing by 50%.  This represents a reduction of $2,875.00.

Therefore, petitioner will be reimbursed costs totaling $846.04 and petitioner's counsel will be reimbursed costs totaling $3,378.95, a reduction in expert costs of $19,975.00.

### VII.    Conclusion

For the reasons set forth above, petitioner established a reasonable basis for the initial filing of his petition as required for an award for attorneys' fees and costs.  Accordingly, an award for attorneys' fees and costs is GRANTED.  However, attorneys' fees and costs are awarded in the reduced amount of $35,038.74 for all the reasons discussed above.

**Accordingly, I award a total of $35,038.74 as follows:**

- **a lump sum of $34,192.70 in the form of a check payable to petitioner and his counsel, Phyllis Widman, Esq.; and**

- **a lump sum of $846.04 in the form of a check payable to petitioner.**

The clerk of the court shall enter judgment in accordance herewith.

**IT IS SO ORDERED.**

s/Daniel T. Horner<br>
Daniel T. Horner<br>
Special Master